## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **TOUCH AMERICA HOLDINGS, INC,** | : | |
| *et al.*[1] | : | Case No. 03-11915 (KJC) |
| Debtors | : | |

## MEMORANDUM[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

### BACKGROUND

On June 19, 2003, Touch America Holdings, Inc. *et al.* (the "Debtors") filed voluntary

petitions for relief under chapter 11 of the United States Bankruptcy Code with the United States

Bankruptcy Court for the District of Delaware (the "Court").   The Debtor's Amended

Liquidating Chapter 11 Plan (docket no. 1853)(the "Plan"), filed on August 17, 2004, was

confirmed by Order of the Court dated October 6, 2004 (docket no. 2172).   Brent C. Williams

(the "Plan Trustee") was appointed as the plan trustee for the plan trust that was established

under the Plan, the Plan Trust Agreement attached as Exhibit A to the Plan, and the Confirmation

Order.

During the pendency of the chapter 11 cases, former officers and directors of the Debtors

filed the following proofs of claim: Tucker Hart Adams (claim no. 3140); Tom Ashburn (claim

---

[1] The following chapter 11 cases are being jointly administered pursuant to an Order dated June 23, 2003 (docket no. 27) : Touch America Holdings, Inc., Touch America, Inc., Entech, LLC, Touch America Purchasing Company, LLC, Touch America Intangible Holding Company, LLC, Sierra Touch America, LLC, and American Fiber Touch, LLC.

[2] This Memorandum constitutes the findings of fact and conclusions of law required by Fed.R.Bankr.P. 7052.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a).   Venue is proper pursuant to 28 U.S.C. § 1409.   This contested matter involves a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(B).

no. 3108); Alan F. Cain (claim no. 3130); John G. Connors (claim no. 3121); Robert Cope (claim

no. 3117); R.D. Corette (claim no. 3116); Richard F. Cromer (claim no. 3113); Kay Foster (claim

no. 3128); Robert P. Gannon (claim no. 3136); John D. Haffey (claim no. 3103); John J. Jester

(claim no. 3138); Carl Lehrkind, III (claim no. 3102); Deborah McWhinney (claim no. 3106);

Michael J. Meldahl (claim no. 3126); Pamela K. Merrell (claim no. 3114); Jerrold P. Pederson

(claim no. 3111); Ellen M. Senechal (claim no. 3112); Noble E. Vosburg (claim no. 3133); and

Michael E. Zimmerman (claim no. 3119) (jointly referred to herein as the "Officers and

Directors" or the "Claimants").[3]  The Officers and Directors  have been named as defendants in a

number of pending civil actions (the "Civil Actions"), and the foregoing proofs of claim assert

claims against the Debtors for reimbursement, indemnification and contribution to the extent the

Officers and Directors incur costs or are held liable under the Civil Actions.[4]

On January 27, 2006, the Plan Trustee filed a motion pursuant to Bankruptcy Code

---

[3]The Plan Trustee attached copies of the Officers' and Directors' proofs of claims to the declaration filed in support of his summary judgment motion, except those filed by Tom Ashburn, Pamela K. Merrell, and Ellen M. Senechal.  These three claimants did not file any response to the Plan Trustee's Subordination Motion (defined *infra*.) and the Plan Trustee intended to request default judgment against them and did not include them in the summary judgment motion.  However, the parties later agreed to include Pamela K. Merrell and Ellen M. Senechal as part of the Stipulation (docket no. 3440) discussed *infra*.  Because he has not responded to any motion, reference to the "Officers and Directors" or "Claimants" herein does not include Tom Ashburn.

[4]The Civil Actions include the following law suits:
(i)     *McGreevey v. Montana Power Co., et al.*, Cause No.: DV-01-141, Montana Second Judicial District Court (Butte-Silver Bow County) and *McGreevey v. Montana Power Co., et al.*, Civ. Nos. 03-01-BU-SEH and 05-62-BU-SEH, United States District Court, District of Montana, (collectively, the "McGreevey Litigation");
(ii)    *EnCana Energy Holdings, Inc. v. Entech, LLC, et al.*, Cause No. CV-03-16. United States District Court, District of Montana (Butte Div.)(the "EnCana Litigation");
(iii)   *Petritz, et al v. Nightingale LLC, et al.*, Cause No. DV-03-158, Montana Second Judicial District Court (Butte-Silver Bow County)(the "Petritz Litigation");
(iv)    *Goldstein v. Touch America Holdings, Inc. et al.*, Cause No. CV-02-57, United States District Court, District of Montana (Butte Div.)(the "Securities Litigation");
(v)     *Edwards v. Montana Power Co., et al.*, Cause No. DV-03-36, Montana Second Judicial District Court (Silver Bow County)(the "Edwards Litigation");
(vi)    *In re Touch America Holding Co., Inc.*, Cause No. CV-02-106-BU-SEH United States District Court, District of Montana (the "ERISA Litigation"); and
(vii)   *Anderson v. Gannon, et al.*, Cause no. DV-02-201, Montana Second Judicial District Court, Silver Bow County (the "Anderson Litigation").

sections 510(b) and 502(e)(1)(B), and Bankruptcy Rule 3007, to subordinate or disallow certain indemnification claims filed by the Officers and Directors (the "Subordination Motion") (docket no. 3020). On March 9, 2006, the Officers and Directors filed a joint Objection to the Subordination Motion (docket no. 3071).

On April 28, 2006, the Plan Trustee filed a motion for partial summary judgment on the Subordination Motion (the "Summary Judgment Motion")(docket no. 3117), along with a brief and a declaration of Maureen D. Luke in support thereof (docket nos. 3118, 3119 and 3120). In the Summary Judgment Motion, the Plan Trustee makes two arguments. First, he argues that the plaintiffs in the Civil Actions assert claims arising from the purchase or sale of securities and seek damages based on the diminution in value of their stock. The Plan Trustee contends that, under applicable law, the Officers' and Directors' indemnification claims arising from the Civil Actions are claims arising from "the purchase or sale of a security," and must be subordinated pursuant to Bankruptcy Code §510(b). Second, he argues certain reimbursement claims are contingent and should be disallowed pursuant to Bankruptcy Code §502(e)(1)(B). The Plan Trustee argues that neither discovery nor an evidentiary hearing is necessary to decide these legal issues and, therefore, summary judgment is appropriate.

On May 11, 2006, the Officers and Directors filed a response opposing the Summary Judgment Motion (docket no. 3130). The Officers and Directors argue that, while the courts have broadly construed the phrase "purchase or sale of a security" of §510(b), the definition is not limitless and is not applicable to all of the Civil Actions. Second, the Officers and Directors argue they are not "co-debtors" on certain claims with the Debtors, making §502(e)(1)(B)

3

inapplicable to those claims as well.[5]   The Plan Trustee filed a Reply to the Officers' and

Directors' objection to the Summary Judgment Motion on May 22, 2006 (docket no. 3134).

Oral argument regarding the Summary Judgment Motion was held on May 31, 2006, and

additional oral argument was held on March 28, 2007, at which the parties reported the

possibility of a partial settlement of the objections to the Summary Judgment Motion.

On May 22, 2007, the Plan Trustee and the Officers and Directors filed a Stipulation,

under certification of counsel (docket no. 3440)(the "Stipulation"), in which the Officers and

Directors agreed to withdraw their indemnification claims arising from the EnCana Litigation,

the Petritz Litigation, the Securities Litigation, and the McGreevey Litigation.[6]   The Stipulation

further stated that the claims arising from the ERISA Litigation and the Edwards Litigation were

*not* withdrawn and the parties asked this Court to address those remaining claims in the

Summary Judgment Motion. Additionally, the Stipulation provided that the claims arising from

the Anderson Litigation were not withdrawn and should not be considered as part of the

Summary Judgment Motion.   The Stipulation was approved by Order of this Court dated May

24, 2007 (docket no. 3441).

Pursuant to the Stipulation, the issues in the Summary Judgment Motion that remain

---

[5]The Officers and Directors also argue that the Plan Trustee cannot object *en masse* to their claims, but should file objections "person by person" and "claim by claim" to meet the Trustee's burden of proof and negate the validity of their properly filed proofs of claim. However, the proofs of claim for indemnification filed by the Officers and Directors contain identical, general language in support of those claims. I can discern no reason why the Plan Trustee cannot proceed in this matter with the Subordination Motion against this group of nearly identical claims.

[6]The indemnification claims were deemed "withdrawn without prejudice to the rights of the Directors and Officers to reinstate the Indemnification Claims arising from the ... Litigation *nunc pro tunc* to the date that the withdrawn ... Indemnification Claims were filed." (*See, e.g.,* Stiplation at ¶1 of the "Agreement").

4

pending before this Court are: (i) whether indemnification claims arising from the ERISA

Litigation arise from the purchase or sale of securities, thereby warranting subordination pursuant

to Bankruptcy Code §510(b); and (ii) whether the indemnification claims arising from the

Edwards Litigation are contingent claims of a co-debtor that should be disallowed pursuant to

Bankruptcy Code §502(e)(1)(B). For the reasons set forth below, the Plan Trustee's request for

summary judgment on subordination of the indemnification claims arising from the ERISA

Litigation under §510(b) will be granted. The Plan Trustee's request for summary judgment on

disallowance of the indemnification claims arising from the Edwards Litigation under

§502(e)(1)(B) will be granted, in part.

## STANDARD - SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c), made applicable to this contested matter by Fed.R.Bankr.P. 7056

and 9014(c). In a motion for summary judgment, the moving party "always bears the initial

responsibility of informing the...court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party has made a proper motion for summary judgment, the burden

shifts to the non-moving party, pursuant to Rule 56(e), which states, "[w]hen a motion for

summary judgment is made and supported as provided in this rule, an adverse party may not rest

5

upon the mere allegations or denials of the adverse party's pleading, but the adverse party's

response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing

that there is a genuine issue for trial. If the adverse party does not so respond, summary

judgment, if appropriate, shall be entered against the adverse party." Fed R. Civ. P. 56(e); *see

also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89

L. Ed. 2d 538 (1986). The party opposing the motion "must do more than simply show that there

is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

Before a court will find that a dispute about a material fact is genuine, there must be

sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The court must view the facts and draw inferences in a light most favorable to the non-moving

party. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513-14. "[W]here the non-moving party's

evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell

Tel. Co.*, 24 F.3d 508, 512 (3d Cir. 1994). It is not the role of the judge to weigh the evidence or

to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment is inappropriate when a

case will turn on credibility determinations. *El v. SEPTA*, 479 F.3d 232 (3d Cir. 2007).

## DISCUSSION

1.    Subordination of indemnification claims arising out of the ERISA Litigation.

The Plan Trustee seeks to subordinate the Officers' and Directors' claims arising from the

ERISA Litigation pursuant to Bankruptcy Code §510(b). 11 U.S.C. §510(b). The Officers and

6

Directors argue that §510(b) does not apply to the ERISA Litigation because the claims are based upon the Officers' and Directors' breach of fiduciary duties established by ERISA, and those claims do not arise from the "purchase or sale" of Montana Power securities.[7] A closer examination of the allegations in the ERISA Litigation complaint is required to determine whether §510(b) applies.

      (a)     Allegations in the ERISA Litigation.

The ERISA Litigation is a putative class action, with the proposed class consisting of all current and former employees who participated in the Plan from September 12, 1999 through November 1, 2001.[8] (ERISA Complaint, ¶1). The Plan is described as a 401(k) retirement savings plan operated and established initially by The Montana Power Company ("Montana Power"), the Retirement Plan Committee for Montana Power (the "Committee"), the Plan's former trustee, Northern Trust Corporation, and Montana Power's Board of Directors (collectively, the "ERISA Defendants"). (ERISA Complaint, ¶2). Montana Power employees who participated in the Plan received matching contributions exclusively in Montana Power stock. Plan participants were unable to sell some or all of their Montana Power shares due to Plan restrictions on the ability of participants to trade in their retirement accounts prior to retirement. (ERISA Complaint, ¶4).

---

[7] The lawsuit is brought under the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. §1132(a)(2) and (3). A copy of the complaint filed in the ERISA Litigation is attached as Exhibit Q to the Declaration in support of the Plan Trustee's Summary Judgment Motion (docket no. 3120)(the "ERISA Complaint").

[8] The "Plan" is defined in the complaint as "the NorthWestern Energy 401(k) Retirement Savings Plan f/k/a the Montana Power Company 401(k) Retirement Savings Plan, f/k/a the Montana Power Company and Subsidiaries Employee Retirement Savings Plan, f/k/a the Montana Power Company Deferred Savings and Employee Stock Ownership Plan.

In the late 1990's, Montana Power executives initiated a series of steps designed to divest Montana Power of its energy business and concentrate, instead, on telecommunications operations. (ERISA Complaint, ¶5). "This divestiture marked a major change in the fundamental nature of [Montana Power], as [the ERISA Defendants] transformed it from a stable and steady power company into a risky and volatile new economy venture." (*Id.*).

On or about August 16, 2001, Montana Power announced a restructuring whereby each share of Montana Power common stock would be exchanged for an equal number of shares of Touch America Holdings, Inc. common stock.[9]  In turn, Touch America Holdings, Inc. would become the parent company of (i) an existing Montana Power subsidiary, Touch America, Inc., and (ii) a new subsidiary, The Montana Power Company, LLC, which held all of the remaining utility assets of the former Montana Power.  The Montana Power Company LLC was subsequently sold to NorthWestern Corporation.[10]  (ERISA Complaint, ¶6).

The Montana Power stock price peaked in March 29, 2000, and then declined steadily as telecommunications stocks began a prolonged plunge. (ERISA Complaint, ¶78). However, Montana Power continued its plan to transition from the utility industry to the telecommunications industry. (*Id.*). In September and October 2000, the ERISA Defendants discussed the possibility of terminating the employee stock ownership plan in conjunction with the proposed sale, distributing to participants the excess balance from the suspense account, and

_____

[9]The restructuring occurred in February 2002.  (ERISA Complaint, ¶57).

[10]As part of its announcement of the restructuring, Montana Power also stated that NorthWestern Corporation would continue to sponsor the 401(k) savings portion of the Plan for at least 24 months after the sale.  The portion of the Plan that was the leveraged employee stock ownership plan - - consisting of the balance of an acquisition loan and unallocated shares - - would be transferred to Touch America Holdings, Inc. after the sale.  (ERISA Complaint, ¶58).

lifting the existing restrictions on diversification of Montana Power stock in individual accounts. (ERISA Complaint, ¶82). However, no action was taken. (*Id.*).

The ERISA Plaintiffs allege that the ERISA Defendants knew or should have known that, given the fundamental change in Montana Power's business strategy, it was not in the best interest of the Plan or the participants to continue to use Montana Power stock as a matching employer contribution, or to allow any Plan assets to be invested in Montana Power stock. (ERISA Complaint, ¶8). The Plaintiffs claim that the ERISA Defendants breached their fiduciary duties by failing to (i) move the Plan's assets out of Montana Power stock, (ii) lift the restrictions on the participants' ability to transfer the stock; and (iii) cease using Montana Power stock for matching contributions. (*Id.*). The Plaintiffs also allege that certain individual ERISA Defendants had conflicts of interest that prevented them from exercising their duties of care, loyalty, and prudence. (ERISA Complaint, ¶9).

The Plaintiffs seek an award of damages (in an unspecified amount) against the ERISA Defendants to compensate them for their injuries resulting from the breach of their fiduciary duties under ERISA.

      (b)    Subordination under Bankruptcy Code Section 510(b).

This dispute centers around the language of Bankruptcy Code §510(b), which provides in pertinent part:

> (b)    For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such

security, except that if such security is common stock, such claim has the
same priority as common stock.

11 U.S.C. §510(b). The plain language of this section is broad enough to include

indemnification claims for both liabilities and expenses incurred on account of a claim for

"damages arising from the purchase or sale" of the debtor's or its affiliate's securities. *In re Mid-
American Waste Systems, Inc.*, 228 B.R. 816, 824 (Bankr.D.Del. 1999); *In re Public Service Co.
of New Hampshire*, 129 B.R. 3, 5 (Bankr.D.N.H. 1991). *See also In re De Laurentiis
Entertainment Group, Inc.*, 124 B.R. 305, 308 (D.C.Cal. 1991)("Reimbursement by definition

includes indemnification, and indemnification naturally includes recovery of attorneys' fees.").

The Officers and Directors argue that the ERISA Litigation plaintiffs sued as plan

participants, not as shareholders, and that their claims are based upon breaches of fiduciary duties

under ERISA, not the sale or purchase of securities.

Section 510(b) is not limited to shareholder claims. *Rombro v. Dufrayne (In re Med
Diversified, Inc.)*, 461 F.3d 251, 258 (2d Cir. 2006)("[A] claimant need not be an actual

shareholder for his claim to be covered by the statute."); *In re Walnut Equipment Leasing Co.*,

1999 WL 1271762, *6 (Bankr.E.D.Pa. Dec. 28, 1999) (The language of §510(b) is not limited to

any particular type of *claimant*, but, rather, focuses on the type of *claim* possessed.). *See also
Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 144 n. 2

(3d Cir. 2002) ("Nothing ... would require the subordination of a claim simply because the

identity of the claimant happened to be a shareholder...."). Thus, the §510(b) analysis does not

hinge on whether the Plaintiffs label themselves as Plan participants or shareholders, but requires

consideration of the underlying nature of their claims.

Specifically at issue is the phrase "arising from the purchase or sale of a security."[11]  This language raises two issues.  The first issue is whether the EIRSA litigation claims are based upon a "purchase or sale" of securities, since the ERISA Plaintiffs received the Montana Power Company stock as a matching contribution under the Plan rather than by purchasing it on the open market.  In *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006), the court recognized that acquiring stock as part of a compensation package could be described, "in common parlance," as a "grant" rather than a "purchase."  *Enron,* 341 B.R. at 150.[12]  The *Enron* Court determined, however, that "this linguistic inconsistency is not legally relevant" (*Id.*) because the claimants had exchanged value for the stock options and, therefore, the exchange fell under a broad reading of the term "purchase."  *Id.* at 151.  Similarly, here, the ERISA Plaintiffs exchanged value for the Montana Power stock, which was received as the employer's matching contribution under the Plan. *See also Frankum v. Int'l Wireless Comm. Holdings, Inc. (In re Int'l Wireless Comm. Holdings, Inc.),* 279 B.R. 463, 457 (D.Del. 2002) ("That [a]ppellants received the [d]ebtors' stock as part of a compensation package does not preclude the transfer from being characterized as a purchase/sale of the [d]ebtors' stock..")  Moreover, the fact that the ERISA Plaintiffs did not choose the form of their employer's matching contribution (Montana Power

---

[11]Bankruptcy Code §101(49) defines the term "security" to include stock.  11 U.S.C. §101(49)(ii).

[12]Many Enron employees had invested in Enron stock as part of their retirement, savings, and compensation plans.  After Enron's demise, many employees who had suffered losses pursued a range of remedial actions in an attempt to salvage something of value.  *Enron,* 341 B.R. at 145.  The *Enron* Court considered whether to subordinate the claims of the former Enron employees asserted in the various lawsuits.  One of the largest actions at issue involved a class of former Enron employees who sued under ERISA, alleging that Enron had "breached its fiduciary duty by failing to provide employees with critical investment information concerning [Enron's] financial condition and by encouraging employees to invest in [Enron's] stock." *Id.*, at 145.

stock) does not affect the "purchase or sale"analysis.  Stock given to an employee as

compensation nonetheless involves a "bargain and exchange of value:"

> If these Claimants were required to receive a portion of their compensation as options,
> that was a condition of employment the Claimants willingly accepted in return for their
> labor.  These Claimants, thus, "purchased" the stock options with their labor.

*Enron*, 341 B.R. at 151.

Second, the phrase "arising from" in §510(b) suggests that the injury need not directly

result from the purchase of the security, but clearly requires some nexus or causal relationship

between the claim and the sale of a security.  *Telegroup*, 281 F.3d at 138; *Enron,* 341 B.R. at

152.  The Third Circuit looked to the legislative history and policies underlying the provision to

delineate the scope of the required nexus and determined that:

> Congress enacted §510(b) to prevent disappointed shareholders from recovering their
> investment loss by using fraud and other securities claims to bootstrap their way to parity
> with general unsecured creditors in a bankruptcy proceeding.

*Telegroup*, 281 F.3d at 142.  In *Telegroup*, the Court considered whether a claim for breach of a

provision in a stock purchase agreement requiring the issuer to use its best efforts to register its

stock and ensure that the stock was freely tradeable "arises from" the purchase of the stock for

the purpose of subordinating the claim under §510(b).  *Id.*, at 136.  Although the conduct at issue

in *Telegroup* occurred after the sale, the Third Circuit held that the breach of contract claim

should be subordinated.  *Id.*  The Court wrote:

> More important than the timing of the actionable conduct, from a policy standpoint, is the
> fact that the claims in this case seek to recover a portion of claimants' equity investment
> In enacting §510(b), Congress intended to prevent disaffected equity investors from
> recouping their investment losses in parity with general unsecured creditors in the event
> of bankruptcy. ... Put differently, because claimants retained the right to participate in

12

corporate profits if [the debtor] succeeded, we believe that §510(b) prevents them from using their breach of contract claim to recover the value of their equity investment in parity with general unsecured creditors. Were we to rule in claimants' favor in this case, we would allow stockholders in claimants' position to retain their stock and share in the corporation's profits if the corporation succeeds, and to recover a portion of their investment in parity with creditors if the corporation fails.

*Id.*, at 142. The Court of Appeals for the Second Circuit, relying, in part, on *Telegroup*, similarly decided:

Because there are only two rationales for mandatory subordination expressly or implicitly adopted by the Congress that enacted section 510(b), we conform our interpretation of the statute to require subordination here only if [the claimant] (1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor.

*Med Diversified*, 461 F.3d at 256.

The *Enron* Court also considered section 510(b)'s "arising from" language when deciding whether to subordinate fraudulent retention claims, i.e., claims that Enron's fraudulent information and financial reporting induced employees to hold onto Enron stock, rather than exercise other options, resulting in significant losses when the share price declined. Because the purchase and retention of the securities are two distinct acts, the court considered whether there was some nexus or causal relationship between the claim and the purchase. *Enron*, 341 B.R. at 152. After examining the case law and the policies underlying Section 510(b), the *Enron* Court decided that it agreed with a decision issued in the *WorldCom* bankruptcy case by the Honorable Adlai S. Hardin, in which he wrote:

From the perspective of section 510(b), it makes no difference whether the stockholders's loss in the value of his stock was caused by a pre-purchase fraud which induced his purchase, or a post-purchase fraud, embezzlement, looting, or other corporate misconduct which undermined the value of his stock. In either case, the stockholder's loss

13

represented by diminution in or destruction of the value of his stock ultimately constitutes a claim for damages derived from his ownership of stock and therefore "arising" from his purchase of the stock, whether the stockholder retained his stock or sold it.

*Enron*, 341 B.R. at 157 *quoting In re WorldCom, Inc.*, 329 B.R. 10, 15-16 (Bankr.S.D.N.Y. 2005).[13]

I conclude that an appropriate reading of section 510(b) brings the ERISA Litigation claims within its scope. By participating in the Plan, the ERISA Litigation plaintiffs took on the risk and return expectations of shareholders. Although the Complaint seeks damages for breach of fiduciary duties, the underlying allegations center around the ERISA Defendants' decision to continue the Plan's investment in Montana Power stock, including continued use of stock as a matching contribution and continued restrictions the Plan participants' ability to transfer the stock, despite the Defendants' alleged knowledge that the stock was a high risk investment that was steadily declining in value. The gist of the ERISA Litigation is to recover damages based upon the lost value of the stock, which are claims are derived from the employees' purchase and ownership of the stock. Section 510(b) applies to subordinate this claim.

For the foregoing reasons, I conclude that the Officers' and Directors' indemnification claims for liability and costs associated with the ERISA Litigation should be subordinated under

---

[13]The *Enron* decision also contains an insightful analysis regarding the claimants' argument against characterizing their interests as equity interests, because the employees viewed their stock awards as a compensation arrangement rather than an investment. The Court noted that: "[w]hile the Claimants do not deny that the value of the employee stock options may increase, they assume that there is a minimum value below which such stock options will not drop." Again recognizing that risk allocation between creditors and security holders is integral to the policy analysis of Section 510(b), the *Enron* Court held that the employees' characterization of the stock options does not change Congressional judgment that security holders should bear the risk of insolvency and securities fraud. *Enron*, 341 B.R. at 168-69. Likewise, the basic premise of the ERISA Litigation is that the Plan participants were injured by the loss of value of the Montana Power stock. Bankruptcy Code §510(b) is intended to apply to claims of this nature.

14

Section 510(b).

2.     Disallowance of claims under Bankruptcy Code §502(e)(1).

The Plan Trustee also seeks summary judgment on his request for disallowance under

Bankruptcy Code §502(e)(1)(B) of the Officers' and Directors' indemnification claims arising

from the Edwards Litigation.  A brief description of the Edwards Litigation follows.

(a)     Allegations in the Edwards Litigation.

Leo Heath and Kevin Edwards (jointly, the "Edwards Plaintiffs") are former employees

of North American Resources Co. ("NARCo"), a wholly owned subsidiary of Montana Power,

until the sale of NARCo to Pan Canadian on or about October 31, 2000. (Edwards Complaint, ¶¶

I, II).  The defendants in the Edwards Litigation are Montana Power, NARCo, Pan Canadian

Petroleum Corp., Pan Canadian Energy Corp., Pan Canadian Energy Resources, Inc., Touch

America, Inc., Encana Energy Corp., Encana Energy Resources, Inc., Robert Gannon, and Jerrold

Pederson.

While employed with NARCo, the Edwards Plaintiffs were eligible participants in the

Montana Power Company U.S. Oil and Gas Operations Management MVA Incentive Plan (the

"MVA Plan").[14]  (Edwards Complaint, ¶¶ I, II).   The purpose of the MVA Plan was to "reinforce

teamwork and to reward team members for their contributions toward improving the economic

value added of [Montana Power] and NARCo."  (Edwards Complaint, ¶ XVI).  The  MVA Plan

was terminated when NARCO was sold to Pan Canadian.  (Edwards Complaint, ¶ XVII).

---

[14]No further information is given in the Edwards Complaint regarding contributions to the MVA
Plan or funding of the MVA Plan's accounts.

Representations by the defendants' officers and directors caused the Edwards Litigation Plaintiffs to believe that the entire amount accumulated under the MVA Plan would be paid to them upon termination. (Edwards Complaint, ¶ XVIII). However, only 25% of the MVA Plan accounts were paid. (Edwards Complaint, ¶ XIX).

The Edwards Plaintiffs assert four claims against the defendants: Count I - Negligence; Count II - Breach of the Implied Covenant of Good Faith and Fair Dealing; Count III - Breach of Fiduciary Duty; and Count IV - Fraud. The Edwards Plaintiffs seek both compensatory and punitive damages.

(b)    Disallowance under §502(e)(1)(B).

The Plan Trustee must prove three elements for disallowance under Bankruptcy Code §502(e)(1)(B) of the indemnification claims relating to the Edwards Litigation: (i) the claims must be contingent, (ii) the claims must be for reimbursement or contribution, and (iii) the debtor and the claimant must be co-liable on the claims.[15]    *In re RNI Wind Down Corp.*, 369 B.R. 174, 181 (Bankr.D.Del. 2007) *citing In re Pinnacle Brands, Inc.*, 259 B.R. 46, 55 (Bankr.D.Del. 2001). "Courts have consistently held that 'the concept of reimbursement includes indemnity.'" *RNI Wind Down*, 369 B.R. at 181-82 *quoting In re Vectrix Bus. Solutions, Inc.*, 2005 WL 3244199 at *3, 2005 Bankr.LEXIS 1712 at *9 (Bankr.N.D.Tex. Sept. 1, 2005). This leaves the

---

[15]Bankruptcy Code §502(e)(1)(B) provides, in pertinent part, as follows:

(e)(1)    [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that - -

....

(B)    such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution;

11 U.S.C. §502(e)(1)(B).

issues of contingency and co-liability.

The Officers and Directors argue that their claims are not contingent, at least to the extent of unreimbursed defense costs incurred to date and continuing. While the Officers' and Directors' defense costs may be liquidated, in part, the claim for costs is still contingent. "A claim is contingent where it 'has not yet accrued and ... is dependent upon some future event that may never happen.'" *RNI Wind Down*, 369 B.R. at 182 *quoting In re GCO Services, LLC,* 324 B.R. 459, 466 (Bankr.S.D.N.Y. 2005).[16]   Indemnification claims are usually contingent until the underlying litigation is resolved. As discussed in the *RNI Wind Down* decision:

> Indemnification is the right to be reimbursed for all out of pocket expenses and losses caused by the underlying claim. The right is typically subject to a requirement that the indemnitee [has] acted in good faith and in a manner that he reasonably believed was in the best interest of the company. As a result, an indemnification dispute generally cannot be resolved until after the merits of the underlying controversy are decided because the good faith standard requires a factual inquiry into the events that gave rise to the lawsuit.

*RNI Wind Down,* 369 B.R. at 185-86 *quoting Majkowski v. Am. Imaging Mgmt. Svcs.,*

913 A.2d 572, 586 (Del.Ch. 2006). In support of his Summary Judgment Motion, the

Plan Trustee has provided copies of the proofs of claim filed by the Officers and

Directors. The proofs of claim filed by the Officers and Directors state that:

> Pursuant to the certificate of incorporation, articles of incorporation or bylaws of the Debtor or of one of its subsidiaries, any employment, indemnification, severance or other agreements between the Creditor [the officer or director named in the proof of claim] and the Debtor [Touch America Holdings, Inc. or its predecessors], or indemnification provisions under applicable state law, the

---

[16] The *RNI Wind Down* decision discusses the Bankruptcy Code's distinction between contingent and unliquidated claims. *RNI Wind Down,* 369 B.R. at 183 n.6. An unliquidated claim is a "claim in which the amount owed has not been determined." *RNI Wind Down,* 369 B.R. at 183 *quoting* BLACK'S LAW DICTIONARY, p. 264 (8th ed. 2004).

> Debtor or its affiliate agreed or is required to indemnify the Creditor from any
> claims asserted against the Creditor in the Litigation arising out of the Creditor's
> service as an officer, director, employee or agent of the Debtor or of one of its
> subsidiaries or affiliates. Accordingly, the Creditor has indemnification claims
> against the Debtor to the extent that the Creditor is liable for any of the
> obligations covered by such indemnification provisions.

The submissions by the Officers and Directors do not provide any basis to conclude that
the claims are other than typical indemnification claims.

The Officers' and Directors' main argument against disallowance under
§502(e)(1)(B), however, is that they are not co-liable with the Debtor on the underlying
claims.[17] The co-liability element requires "a finding that the causes of action in the
underlying lawsuit assert claims upon which, if proven, the debtor could be liable but for
the automatic stay." *In re Wedtech Corp.*, 85 B.R. 285, 290 (Bankr.S.D.N.Y. 1988). In
*Wedtech*, the Court was asked to disallow indemnification claims filed by former
directors (among other positions) of the debtor (the "Wedtech Directors") for losses and
expenses incurred in lawsuits brought by shareholders, bondholders, and noteholders.
The *Wedtech* Court examined the various causes of action asserted in the underlying
lawsuits to determine whether the Wedtech Directors and the corporate debtor could be
co-liable on those causes of action, if the allegations were proven.

---

[17]The Officers' and Directors' response to the Summary Judgment Motion was filed prior to the
parties' stipulation that resolved these issues with respect to most of the pending Civil Litigation. In
arguing against co-liability, the Officers and Directors argued that the underlying claims are derivative
claims, i.e., claims alleging injury to the corporation. *See* 12B Fletcher Cyc. Corp. §5911 (2006). The
claims asserted in the Edwards Litigation, however, are not derivative and, therefore, the basis of the
Officers' and Directors' argument under §502(e)(1)(B) is not applicable here. Similarly, the Officers'
and Directors' reliance on the case *In re Southern Cinemas, Inc.*, 256 B.R. 520 (Bankr.M.D.Fla. 2000) is
not applicable to the Edwards Litigation.

18

At least one defendant in the Edwards Litigation is a debtor in this case, i.e., Touch America, Inc. As discussed above, the Edwards Litigation complaint alleges claims for negligence, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty and fraud. Under Montana law, "[a]s a matter of public policy, officers and agents of a corporation are shielded from personal liability for acts taken on behalf of the corporation in furtherance of corporate goals, policies and business interests. The exception to this policy is where the officer personally committed a tort." *Little v. Grizzly Mfg.*, 195 Mont. 419, 424, 636 P.2d 839, 842 (Mont. 1981)(citations omitted). The Edwards Litigation alleges that all of the defendants committed the torts described in the complaint. If proven, Touch America, Inc. and some Officers and Directors could be co-liable on the underlying merits of the Edwards Litigation.[18]

The purpose of Bankruptcy Code §502(e)(1)(B) is "to preclude redundant recoveries on identical claims against insolvent estates in violation of the fundamental Code policy fostering equitable distribution among all creditors of the same class." *In re Hemingway Transport, Inc.*, 993 F.2d 915, 923 (1st Cir. 1993). If both the Edwards Plaintiffs' claims and the Officers' and Directors' indemnification claims are fully allowed, the Debtors could be subject to a double payment on the same claim, which violates the statute's language and purpose.

---

[18] The parties have argued previously, in connection with other motions in adversary proceedings, that the debtor Touch America Holdings, Inc. is the successor corporation to Montana Power Company, one of the defendants in the Edwards Litigation. However, due to the lack of record on this issue in connection with this motion, I do not make any finding or conclusion of law herein on the issue of whether Touch America Holdings, Inc. is liable for claims against Montana Power Company.

There remains an issue not directly raised or discussed by the parties concerning allowability of the portion of the claims for attorneys' fees and expenses. In *RNI Wind Down*, Judge Sontchi decided that indemnification claims for attorneys' fees and expenses should not be disallowed under §502(e)(1)(B) because co-liability on the indemnification of the attorneys' fees and costs was absent. Further, the Court noted that allowing the indemnification claim for costs does not violate the purpose of the statute, since there was no risk of double payment.

As recognized in *RNI Wind Down*, other courts have decided, differently, that "if there is co-liability on the underlying action, then any amounts sought by way of indemnification, including attorney's fees and expenses, 'on account' of the underlying suit are subject to disallowance under section 502(e)(1)(B)." *RNI Wind Down*, 369 B.R. at 190 *citing In re Wedtech Corp.*, 87 B.R. 279, 287 (Bankr.S.D.N.Y. 1988); *Sorenson v. The Drexel Burnham Lambert Group, Inc. (In re The Drexel Burnham Lambert Group, Inc.)*, 146 B.R. 92, 97 (S.D.N.Y. 1992) and *In re Drexel Burnham Lambert Group, Inc.*, 148 B.R. 982, 989 (Bankr.S.D.N.Y. 1992). Judge Sontchi noted that these cases either collapsed the reimbursement and co-liability elements of §502(e)(1)(B), or did not discuss the distinction between damages and defense costs. This distinction could not be ignored in the *RNI Wind Down* case because the officer involved had waived his right to indemnification for losses incurred as a result of the underlying claims, *except* for his attorneys' fees and expenses. *RNI Wind Down* 369 B.R. at 183.

Because this issue is one of first impression for the undersigned and because it was not directly raised or discussed initially by the parties, I will order additional briefing

and argument on this issue.

In summary, the Officers' and Directors' indemnification claims for liability arising out of the causes of action asserted Edwards Litigation will be disallowed, in part, under §502(e)(1)(B) because the Plan Trustee has shown that those claims are for reimbursement, are contingent, and that the Debtor (defendant Touch America, Inc.) may, conceivably, be co-liable on those claims. However, a decision on whether to disallow the Officers' and Directors' indemnification claims for attorney fees and expenses incurred in connection with the Edwards Litigation under §502(e)(1)(B) will be reserved pending further briefing and argument.

## CONCLUSION

For the reasons set forth above, the Plan Trustee's Summary Judgment Motion will be granted, in part, as follows:

- the Officers' and Directors' indemnification claims arising out of the ERISA Litigation will be subordinated pursuant to Bankruptcy Code §510(b); and

- the Officers' and Directors' indemnification claims for liability arising out the Edwards Litigation will be disallowed pursuant to Bankruptcy Code §502(e)(1)(B).

Disposition of that part of the Plan Trustee's Summary Judgment Motion concerning whether the Officers' and Directors' indemnification claims for attorneys' fees and expenses arising out of the Edwards Litigation should be disallowed pursuant to

21

Bankruptcy Code §502(e)(1)(B) will be reserved pending further briefing and argument.

An appropriate Order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: January 18, 2008

22